UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JANE DOE, | : | **Civil Action No:** |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| YALE UNIVERSITY, | : | |
| Defendant. | : | March 12, 2026 |

## COMPLAINT

1.      This civil rights action arises from the wrongful academic dismissal of a high-achieving international graduate student who suffered from documented mental health disabilities—including post-traumatic stress disorder ("PTSD"), major depression, anxiety, and a sleep disorder—stemming in significant part from a sexual assault she endured while enrolled in a joint degree program with Yale. Despite repeated disclosures of her disabilities to Yale administrators over a period spanning nearly two years, Yale never once offered Ms. Doe a reasonable accommodation, never referred her to Student Accessibility Services ("SAS"), and never engaged in the interactive process required by federal law. When Ms. Doe's disabilities predictably affected a small portion of her Spring 2025 coursework, Yale rigidly applied its Quality Standard to dismiss her on the eve of her graduation—notwithstanding that she had already earned more than the 36 credit units required to receive her degree, all at grades of Proficient or above.

2.      Yale's Faculty Review Board ("FRB") then denied Ms. Doe's appeal in a proceeding conducted by a single administrator—Deputy Dean Anjani Jain ("Jain")—who interrupted her repeatedly, denied the existence of her mental health conditions without medical qualification, smirked when she disclosed her sexual assault history, accused her of lying, and told her to "shut up." Ms. Doe suffered a mental health crisis immediately following this

1

proceeding and was hospitalized at Yale New Haven Psychiatric Hospital, where her attending psychiatrist stated that "[Jane]'s mental health concerns contributed to her inability to complete course work and that this should be taken into consideration."

3.      Yale refused to consider this medical evidence, refused to reopen its appeal process, refused to permit a pending grade change by a professor that would have brought Ms. Doe into compliance with the Quality Standard, and refused to confer a degree she had earned. Yale's Office of Institutional Equity and Accessibility ("OIEA") subsequently investigated Ms. Doe's complaint and declined to find a policy violation, relying on the rationale that Ms. Doe's accommodation request was "retroactive"—a conclusion that ignores Yale's own longstanding knowledge of her disabilities and its repeated failures to direct her to accommodations throughout her enrollment.

4.      As a direct and proximate result of Yale's conduct, Ms. Doe lost her degree from Yale, lost her degree from HEC Paris (which was conditioned upon completion of the Yale program), lost her F-1 visa status, was forced to leave the United States under threat of immigration enforcement, was hospitalized for psychiatric crisis including suicidal ideation, and has suffered severe emotional distress, loss of career opportunity, and ongoing harm to her physical and mental health.

**PARTIES**

5.      Plaintiff Jane Doe is an individual and citizen of the People's Republic of China who, at all relevant times, was a graduate student enrolled in the Master of Management Studies in Global Business and Society ("MMS-GBS") program at the Yale School of Management ("Yale SOM") in New Haven, Connecticut. Ms. Doe was present in the United States pursuant to an F-1 student visa maintained through her enrollment at Yale.

6.      Defendant Yale University is a private university organized under the laws of the State of Connecticut, with its principal place of business at New Haven, Connecticut. Yale University is a recipient of federal financial assistance within the meaning of Section 504 of the Rehabilitation Act and Title IX. Yale University is a place of public accommodation within the meaning of Title III of the Americans with Disabilities Act. Yale SOM is a graduate school within Yale University that administers the MMS-GBS program in which Plaintiff was enrolled.

7.      At all relevant times, the Yale administrators, faculty, and staff referenced in this Complaint—including but not limited to Anjani Jain, Deputy Dean for Academic Programs; Anita Sharif-Hyder, Dean of Students and Assistant Dean of Academic Affairs and Student Life; Daniel J. Dwyer, Director of Curricular Advancement; Shannon Foley, Director of Curricular Advancement; and other Yale personnel—acted within the course and scope of their employment with Yale University, and their acts and omissions are attributable to Yale.

**JURISDICTION AND VENUE**

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction). This action arises under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and their anti-retaliation provisions.

9.      This Court has supplemental jurisdiction over the state-law claims asserted herein pursuant to 28 U.S.C. § 1367, as those claims are so related to the federal claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. The state-law claims arise from the same nucleus of operative facts as the federal claims.

10.     Venue is proper in this judicial district because Yale University is headquartered in and maintains its principal place of business in New Haven, Connecticut, within the District of Connecticut. All of Yale's relevant officers, faculty, and administrators reside and work in Connecticut. A substantial part of the events or omissions giving rise to the claims occurred at Yale University in New Haven, Connecticut, including all alleged acts of discrimination, retaliation, breach of contract, and infliction of emotional distress.

**FACTUAL ALLEGATIONS**

**A.      Ms. Doe's Academic Background and Enrollment**

11.     Prior to commencing her studies at Yale, Ms. Doe enjoyed a successful career as a policy consultant. She was accepted into the MMS-GBS program at Yale SOM as part of a concurrent degree program (the "Program") in partnership with HEC Paris, a leading European business school.

12.     The Program is designed such that students complete coursework at HEC Paris and then at Yale SOM. Under the Program's structure, the HEC Paris degree is conferred only upon completion of the Yale portion. The Yale portion is designed to be completed in one academic year.

13.     According to the Bulletin of Yale University, School of Management ("SOM Bulletin"), the requirements for the MMS-GBS degree include: (a) a grade of Pass or better in 36 units of coursework; (b) a minimum of 18 units of coursework in the first term; and (c) achievement of credit in the GBS required curriculum.

14.     The SOM Bulletin further establishes a "Quality Standard" for the MMS-GBS program, which provides that a student may not accumulate grades below Proficient (i.e., Fail or

Pass grades) in more than eight credit units of courses in a single term, or more than ten units cumulatively.

**B.      Sexual Assault at HEC Paris and Resulting Disabilities**

15.      While studying at HEC Paris in the Fall of 2022, Ms. Doe was sexually assaulted by another person enrolled in the same joint degree program. The assault caused Ms. Doe severe trauma, distress, anxiety, loss of sleep, and depression.

16.      Ms. Doe reported her assault to law enforcement and to HEC Paris, which investigated the matter. Because Ms. Doe was enrolled in the joint program, upon information and belief, Yale had knowledge of or access to information regarding Ms. Doe's sexual assault and the investigation.

17.      Following the assault, Ms. Doe sought treatment including therapy and was diagnosed with PTSD. Her treating providers also documented depression, anxiety, and a sleep disorder.

18.      Despite Ms. Doe's concurrent enrollment in the joint program and Yale's awareness, or constructive knowledge, of the sexual assault, Yale never contacted Ms. Doe to offer resources, accommodations, or support.

**C.      Ms. Doe's First Disclosure to Yale and Delayed Enrollment**

19.      Ms. Doe had been scheduled to begin her studies on the Yale campus in the Fall of 2023. Due to the ongoing effects of her sexual assault on her mental health, she requested additional time to complete arrangements at HEC Paris before beginning at Yale.

20.      In correspondence directed to Evelyn Wilson, Associate Director of Admissions for Management Master's Programs at Yale, Ms. Doe explicitly described her mental health conditions and her sexual assault history as the basis for her request.

21.     Rather than permitting Ms. Doe to begin the program a few days late or providing other accommodations, Yale delayed her start to the Fall of 2024. As a consequence of this delayed enrollment, Ms. Doe lost a $20,000 scholarship.

22.     At no point during this exchange did Yale offer Ms. Doe accommodations, refer her to SAS, or initiate an interactive process regarding her disclosed disabilities.

**D.     Ms. Doe's Treatment at Yale Health and Further Disclosures**

23.     In August 2024, shortly before beginning her coursework at Yale, Ms. Doe met with Margaret Milardo-Ward, LCSW, at Yale Health. During this meeting, Ms. Doe discussed her anxiety, depression, and anticipated needs related to her mental health conditions. She received additional clarification and confirmation of her diagnosed conditions.

24.     Despite this direct disclosure to a Yale Health provider regarding her diagnosed conditions—conditions that had their genesis in a sexual assault known to the University—Yale did not offer Ms. Doe any accommodations, did not refer her to SAS, and did not initiate the interactive process.

25.     In November 2024, Ms. Doe sought treatment at Yale Health for persistent fatigue, memory issues, chronic pain, headaches, tingling in her arms, and a sleeping disorder. Yale Health confirmed her diagnosis of a sleep disorder at that time.

26.     At no time during the Fall 2024 term did any Yale official or Yale Health provider refer Ms. Doe to SAS or inform her of her right to request disability accommodations through that office.

**E.     Ms. Doe's Strong Academic Performance in Fall 2024**

27.     Despite the challenges posed by her mental health conditions, Ms. Doe performed exceptionally well in her first term at Yale. In the Fall 2024 term, Ms. Doe completed 28 credit units—well in excess of the 18-unit minimum requirement.

28.     Ms. Doe received grades of Highest Honors, Honors, or Proficient for every course she completed in the Fall 2024 term. She received no grades of Pass or Fail. She also audited one course for no credit.

29.     After the Fall 2024 term, Ms. Doe needed only eight additional credit units of coursework at the grade of Pass or better to satisfy the 36-unit degree requirement.

**F.     Deterioration of Ms. Doe's Health in Spring 2025**

30.     In the Spring 2025 term, Ms. Doe's physical and mental health deteriorated significantly. Her symptoms of PTSD, depression, anxiety, and her sleep disorder escalated. She underwent regular physical therapy to address her conditions.

31.     On or about March 6–7, 2025, Ms. Doe was detained at an airport for more than 24 hours with a high fever prior to departure for a Yale credit-earning trip to South Africa. The detention exacerbated her symptoms significantly.

32.     Despite remaining focused on her coursework during and immediately after the detention, Ms. Doe missed a single submission deadline for MGT 667, Rollups, Consolidations, and Programmatic Acquisitions ("RCPA"), taught by Professor A.J. Wasserstein.

33.     On March 17, 2025, Ms. Doe requested an extension from the teaching assistant for RCPA and from the Academic Affairs and Student Life office ("AASL"), explaining the circumstances of her detention, fever, and exhaustion. Both declined to extend the deadline. The failure to grant the extension resulted in Ms. Doe receiving a grade of Pass in the course rather than Proficient.

34.     Around this same period, reports of the presence of U.S. Immigration and Customs Enforcement ("ICE") agents in plain clothes on or near the Yale campus caused widespread fear among international students. As an international student on an F-1 visa in her final term, Ms. Doe experienced extreme mental distress, insomnia, and exacerbated PTSD symptoms as a result of these reports.

### G.     The Honor Code Proceeding and Sanction

35.     On April 9, 2025, just before the start of her MGT 874 (Patterns in Entrepreneurship) class, Ms. Doe experienced a heightened heart rate—a symptom consistent with her diagnosed anxiety and PTSD. She asked a classmate to sign her name on the attendance sheet if she missed it while she tried to stabilize herself, intending to enter the classroom shortly.

36.     Upon information and belief, the practice of signing in for classmates who were running late or temporarily absent was common at Yale SOM, including among teaching assistants.

37.     Ms. Doe attempted to attend the class but, after walking slowly to avoid exacerbating her symptoms, arrived when only approximately 15–20 minutes remained, with a guest speaker present. She chose not to enter the room at that late point. Ms. Doe attempted to file the class specific medical absence form and asked two classmates' help to locate the form.

38.     Since there was no medical absence form available on Canva as required, After the class, Ms. Doe went to AASL and reported her physical and mental sufferings, requesting the assistance from Sage Fortune,a Senior Administrative Assistant, to correct her attendance as a medical absence. Fortune instead provided her the medical absence link for this class. However, the form required prior consultation with a medical professional, which Ms. Doe had

not yet completed. Being unwilling to submit the form with a false attestation, Ms. Doe did not submit it immediately.

39.     On April 10, 2025, Dean of Students Anita Sharif-Hyder met with Ms. Doe. During this meeting, Ms. Doe showed Sharif-Hyder the medical absence form she had attempted to complete, explained her suffering, and described her PTSD and heightened symptoms. Rather than assisting Ms. Doe in obtaining accommodations or a medical absence, Yale initiated Honor Code proceedings against her.

40.     On or about April 25, 2025, the Honor Committee held its meeting regarding the alleged violation. That same day, several of Ms. Doe's classmates reported learning of ICE's presence near the Yale SOM campus, further heightening Ms. Doe's anxiety.

41.     At the Honor Committee meeting, Ms. Doe disclosed her mental health conditions and described her suffering. However, she did not feel comfortable sharing the full extent of her sexual assault history with a large group of unfamiliar individuals.

42.     The Honor Committee, through its Chairperson, James Choi, found that Ms. Doe had asked a classmate to "falsify" her attendance record and imposed a sanction of a one-week suspension and a grade of Fail ("F") in MGT 874.

43.     The F grade in MGT 874, combined with the Pass grades Ms. Doe received in other courses during the Spring 2025 term, caused her to exceed the Quality Standard's limit of eight credit units of Pass or Fail grades in a single term.

## H.     Yale's Failure to Provide Accommodations Despite Repeated Disclosures

44.     Throughout April 2025, Ms. Doe spoke with Sharif-Hyder on multiple occasions about the worsening of her mental distress, anxiety, insomnia, and physical

symptoms, particularly in light of the ICE-related fears and the political climate affecting international students.

45.      At no point during these conversations did Sharif-Hyder or any other Yale official offer Ms. Doe accommodations, refer her to SAS, or initiate the interactive process required by federal disability law.

46.      Instead, Sharif-Hyder informed Ms. Doe that she was required to attend exams in person, that she needed to appeal her one-week suspension, and that "no alternative options" were available.

47.      Ms. Doe sought guidance from Sharif-Hyder on the appeal process. Sharif-Hyder advised Ms. Doe that she could "withdraw" her appeal of the Honor Committee sanction after exams so that she would be "looked at more favorably" by Yale. This advice later proved to be incorrect and detrimental.

48.      Upon information and belief, Sharif-Hyder, by virtue of her position in Yale administration, functioned as a mandated reporter and/or responsible employee with obligations under Yale policy and federal law upon receiving disclosures of disability and sexual assault. Despite these obligations, Sharif-Hyder at no point provided Ms. Doe with information about accommodations or referred her to SAS or other appropriate offices.

I.      **Assurances from Yale Officials Regarding Degree Conferral**

49.      On or about May 11, 2025, Ms. Doe contacted Shannon Foley, Director of Curricular Advancement, expressing concern about receiving 10 credit units of Pass or Fail grades in the Spring 2025 term. Upon evaluation of Ms. Doe's credits, Foley communicated that there would be no concern about the Spring 2025 grades because Ms. Doe had completed the

required 36 credit units to receive her degree with grades of Highest Honors, Honors, and Proficient.

50.     On or about May 12, 2025, Ms. Doe attempted to withdraw her appeal of the Honor Committee sanction per Sharif-Hyder's prior advice. Sharif-Hyder instead directed her to speak with Daniel J. Dwyer, Director of Curricular Advancement.

51.     During their meeting, Dwyer informed Ms. Doe that she would likely face dismissal due to the number of Pass and Fail grades she received in the Spring 2025 term. He further told her she could not withdraw her prior appeal and would need to appeal any dismissal decision.

52.     During the same meeting, Ms. Doe explained her mental health conditions and described her 36 credit units of Highest Honors, Honors, and Proficient grades. Dwyer acknowledged that Ms. Doe's completion of credits far in excess of those required by the Program should suffice to receive her degree. Dwyer further advised Ms. Doe to submit an appeal detailing the airport detention, her mental health conditions, the missed submission, and the impact of the political climate and ICE presence.

**J.     The May 15, 2025 Notice of Academic Dismissal**

53.     On May 15, 2025, just days before commencement, Ms. Doe received a letter from Dwyer (the "May 15 Letter") notifying her that she had "failed to meet the MMS in Global Business and Society program's Quality Standard by accumulating more than 8 units of Pass grades in [her] course work in a single term." The letter stated that Ms. Doe was dismissed from the Program due to accumulation of Pass or Fail grades totaling 10 units in the Spring 2025 term.

54.     The May 15 Letter stated that Ms. Doe could appeal by written petition to Jain and the Faculty Review Board, per the SOM Bulletin, and that the FRB meeting would occur on May 16, 2025—the very next day.

55.     The SOM Bulletin provides that "[a]n appeal must be filed within two weeks (ten working days) from the date of the letter notifying the student of the dismissal." Ms. Doe was given approximately one day.

**K.     The Faculty Review Board Proceeding**

56.     On May 16, 2025, Ms. Doe appeared before the Faculty Review Board. The proceeding was conducted by Jain alone, without a full FRB panel, contrary to the procedures described in the SOM Bulletin.

57.     During the proceeding, Ms. Doe presented her case, including her mental health conditions, her suffering and pain, and the circumstances of the airport detention.

58.     Jain interrupted Ms. Doe repeatedly throughout her presentation. He denied that she had any mental health conditions, notwithstanding his lack of any medical qualification to make such an assessment. He minimized her suffering. When Ms. Doe disclosed her history of sexual assault at HEC Paris, Jain smirked, continuously shook his head, refused to allow her to elaborate on her documented mental health disability, and indicated that he did not want to hear about her sexual assault.

59.     When Ms. Doe referenced her conversation with Foley regarding her having earned sufficient credits to graduate, Jain accused her of lying and told her to "shut up" unless she had written evidence.

60.     Ms. Doe informed Jain that a professor, Professor Saman Majd, who taught Fixed Income Securities, was willing to review whether a grade change from Pass to Proficient

was warranted. Jain initially stated that a professor-initiated grade change would be acceptable, then reversed himself, stating that any such request would have had to be made before the appeal meeting.

61.     Jain attempted to minimize Ms. Doe's circumstances by stating that "all international students are anxious and under stress," failing to engage with the specific, documented nature of Ms. Doe's disabilities.

62.     The SOM Bulletin provides that students have the right to be accompanied by an advisor at appeal proceedings, the right to examine written materials at least 48 hours in advance, and the right to object to committee members. Ms. Doe was afforded none of these protections.

**L.     Denial of Appeal and Immediate Consequences**

63.     On May 17, 2025, Jain sent Ms. Doe a letter formally communicating the FRB's denial of her appeal of academic dismissal (the "May 17 Letter"). The letter stated that the dismissal was effective immediately and that the final notation on her academic transcript would read "academic dismissal." The letter stated that no further appeal was possible under University rules.

64.     The May 17 Letter further stated that the FRB had considered only Ms. Doe's appeal of academic dismissal and that her separate appeal of the Honor Committee's sanction was deemed "moot" because of the academic dismissal.

65.     The letter noted that although Yale would permit Ms. Doe to participate in the May 19, 2025 commencement ceremony as "a matter of courtesy," her participation would "not in any way imply" that she would earn the MMS-GBS degree.

66.     Upon information and belief, Yale foreclosed the opportunity for Professor Majd to change Ms. Doe's grade in Fixed Income Securities from Pass to Proficient on the ground that her appeal had already been denied. Had the grade been changed, Ms. Doe would have had only eight credit units with Pass or Fail grades in the Spring 2025 term—within the permissible limit of the Quality Standard.

**M.    Psychiatric Hospitalization and Medical Evidence**

67.     As a direct result of Jain's conduct during the FRB proceeding and the news that she would be expelled from Yale, Ms. Doe suffered a psychiatric emergency. She called Yale's Mental Health Emergency telephone number and received an appointment for May 19, 2025.

68.     On or about May 17–18, 2025, Ms. Doe sent correspondence to Sharif-Hyder disclosing details of her sexual assault history and requesting accommodations. In this correspondence, Ms. Doe explained that she had been reluctant to disclose the full extent of her trauma during the FRB proceeding because doing so with an all-male panel would be retraumatizing, and because the prospect of revisiting her sexual assault was profoundly distressing.

69.     Sharif-Hyder responded by stating that the FRB's decision was final and that it was "not permissible to add more information in support of the appeal once the FRB has reached a decision."

70.     Ms. Doe was hospitalized at Yale New Haven Psychiatric Hospital for inpatient psychiatric treatment. On May 22, 2025, her attending psychiatrist, Dr. Sean Patterson, MD, signed a discharge attestation stating, in relevant part that "her mental health concerns

contributed to her inability to complete course work and that this should be taken into consideration."

71.     Dr. Patterson confirmed Ms. Doe's diagnoses of PTSD and depression, and noted that her symptoms included suicidal ideation, insomnia, anxiety, and related impairments. Dr. Patterson assessed Ms. Doe's admission as most consistent with an adjustment disorder versus a major depressive episode.

72.     The first time she approached the Yale therapist Margaret Milardo-Ward, the therapist was willing to meet with her after graduation day, but did not yet know about the sexual assault report that Plaintiff had made. Following her hospitalization, Ms. Doe requested and scheduled virtual appointments with the same Yale therapist. After Plaintiff's report of sexual assault was made to SAS and wider school staff, the therapist refused to meet with her twice without explanation.

**N.     Title IX Referral and Inaction**

73.     On May 19, 2025, Jordan Colbert made a Title IX referral to OIEA regarding the sexual assault Ms. Doe had endured.

74.     Raquel McDowell, Associate Director of the Title IX Office of OIEA, contacted Ms. Doe as a result. McDowell and Ms. Doe met on May 27, 2025, and Ms. Doe described the suffering she had endured.

75.     McDowell indicated that the Title IX Office could reach out to Yale SOM to explore "what, if any, options may be available." Subsequently, McDowell's colleague, Jason Killheffer, contacted Ms. Doe on May 30, 2025, and stated that "the Title IX Office does not have any support measures to offer that would alter" the outcome of her academic standing. The only resource offered was the SHARE Center.

### O.    The OIEA Investigation

76.    On May 29, 2025, Ms. Doe filed a formal complaint with OIEA, alleging that Yale SOM discriminated against her on the basis of her disability by declining to apply a policy exception and by failing to provide her with a reasonable accommodation.

77.    On May 30, 2025, SAS formally denied Ms. Doe's request for a modification to the appeal process, stating that her request was for a "retroactive accommodation" and that students must submit and be qualified for an accommodation in advance.

78.    On July 21, 2025, OIEA issued its Findings Report, No. 2024130501, concluding that Yale's Policy Against Discrimination and Harassment was "not violated."

79.    The OIEA Report acknowledged that Plaintiff had a disability and that she had disclosed details of her condition in correspondence with Sharif-Hyder on May 17–18, 2025. The Report further acknowledged that Ms. Doe's reluctance to disclose her disability earlier was connected to the trauma of her sexual assault and her discomfort discussing it with male administrators.

80.    The OIEA Report's conclusion rested primarily on two findings: (a) that Ms. Doe's accommodation request was "retroactive" because she did not formally disclose her disability to SAS until after the appeal process was complete; and (b) that the School was "not aware of her disability until the appeal process was complete."

81.    The OIEA Report's finding that the School was not aware of Ms. Doe's disability until after the appeal process was complete is contradicted by the record, which demonstrates that Ms. Doe disclosed her mental health conditions and their connection to her sexual assault to multiple Yale officials—including Wilson, Milardo-Ward, Yale Health

providers, Sharif-Hyder, Dwyer, and the Honor Committee—on numerous occasions between the Summer of 2023 and May 2025.

82.     The OIEA Report's conclusion that SAS "cannot consider or provide retroactive accommodations" fails to address Yale's obligation under federal law to engage in the interactive process upon learning of a student's disability, regardless of whether the student has formally registered with the designated disability services office. The obligation to provide reasonable accommodations arises when the institution has knowledge of the disability and the need for accommodation, not merely when the student completes a particular bureaucratic process.

83.     The OIEA Report confirmed that Yale's Policy Against Discrimination and Harassment prohibits retaliation against all individuals who participate in an OIEA review.

**P.      Ms. Doe's Completion of Degree Requirements**

84.     In the Fall 2024 term, Ms. Doe completed 28 credit units with grades of Highest Honors, Honors, or Proficient for every course. She received no Pass or Fail grades.

85.     In the Spring 2025 term, Ms. Doe received: (a) Honors for two credit units (bringing her cumulative total to 30 credits at Proficient or above); (b) Proficient for six credit units (bringing her cumulative total to 36 credits at Proficient or above—the exact number required for degree conferral); (c) Pass for eight credit units; and (d) Fail for one course (MGT 874, Patterns in Entrepreneurship), resulting from the Honor Committee sanction, for which she received no credit.

86.     Ms. Doe thus accumulated 36 credit units at grades of Proficient or above—the precise number required by the SOM Bulletin for conferral of the MMS-GBS degree. The

additional courses in which she received Pass grades were elective courses taken to advance her education, not courses needed to fulfill the 36-unit degree requirement.

87.    The SOM Bulletin requires "a grade of Pass or better, in 36 units of course work." Ms. Doe satisfied this requirement. The Quality Standard, which limits the number of Pass or Fail grades per term, operates as a separate condition. However, reasonable accommodation of Ms. Doe's documented disabilities—through, for example, a deadline extension for MGT 667 or consideration of the circumstances underlying the Honor Committee sanction—would have prevented Ms. Doe from exceeding the Quality Standard threshold.

88.    Moreover, had Yale permitted the grade change in Fixed Income Securities that Professor Majd was prepared to consider, Ms. Doe's Pass credits for the Spring 2025 term would have totaled eight—within the Quality Standard limit.

### Q.    Visa Consequences and Forced Departure

89.    As an international student, Ms. Doe maintained her lawful presence in the United States through an F-1 visa tied to her enrollment at Yale. Upon her dismissal, Ms. Doe's F-1 visa status was revoked.

90.    Upon her discharge from the psychiatric hospital, Ms. Doe found multiple emails from Yale instructing her to leave the country by May 30, 2025, due to her F-1 visa status.

91.    Ms. Doe was forced to seek alternative visa arrangements and to depart the United States under the threat of immigration enforcement during a period of heightened ICE activity targeting international students. This caused her extreme additional emotional distress, compounding her existing PTSD symptoms.

### R.    Impact on HEC Paris Degree

92.     On or about May 20, 2025, Yale informed HEC Paris that it would not award Ms. Doe a degree. As a result, HEC Paris withheld Ms. Doe's degree from HEC Paris, despite her having completed all required credits for the Master in Management with the Major of an International Double Degree at HEC Paris.

93.     Ms. Doe has thus been deprived of both the Yale MMS-GBS degree and the HEC Paris degree she earned through her coursework.

**S.     Yale's Knowledge of Ms. Doe's Disability**

94.     Yale had actual or constructive knowledge of Ms. Doe's mental health disabilities through multiple channels and disclosures spanning nearly two years, including but not limited to:

a. Information available to Yale through the joint degree program with HEC Paris regarding Ms. Doe's sexual assault and its aftermath;

b. Ms. Doe's communications with Evelyn Wilson in the Summer of 2023, in which she explicitly disclosed her mental health conditions and sexual assault;

c. Ms. Doe's request for accommodation prior to the Fall 2023 term, citing her mental health conditions;

d. Ms. Doe's treatment at Yale Health with Margaret Milardo-Ward, LCSW, in August 2024, during which she discussed her anxiety, depression, and anticipated needs;

e. Ms. Doe's treatment at Yale Health in November 2024 for persistent fatigue, memory issues, chronic pain, headaches, tingling in her arms, and a sleep disorder;

f. Ms. Doe's request for a deadline extension in March 2025 following her airport detention, which described the circumstances affecting her health;

g. Ms. Doe's communications with AASL regarding the medical absence form in April 2025;

h. Ms. Doe's multiple discussions and correspondence with Sharif-Hyder throughout April 2025 regarding her mental distress, anxiety, insomnia, and physical suffering;

i. Ms. Doe's disclosures during the Honor Committee proceeding on or about April 25, 2025;

j. Ms. Doe's discussions with Foley and Dwyer in May 2025;

k. Ms. Doe's disclosures during the FRB meeting with Jain on May 16, 2025;

l. Ms. Doe's post-appeal correspondence with Sharif-Hyder on May 17–18, 2025, providing detailed medical information and requesting accommodations; and

m. The Title IX referral by Jordan Colbert on May 19, 2025, and subsequent communications with McDowell and Killheffer.

95.    Despite all of these disclosures, Yale at no point offered Ms. Doe accommodations, referred her to SAS, or initiated the interactive process required by federal disability law until after her dismissal was finalized and her appeal denied—and then only to deny her request as "retroactive."

**T.    Selective Enforcement and Disparate Treatment**

96.    Upon information and belief, Yale has permitted previously dismissed students who suffered similar mental health conditions to be reinstated following appeals.

97.    Upon information and belief, Yale provided accommodations to several students in the Fall 2023 and Fall 2024 terms permitting them to arrive late to campus and forego orientation exercises for a variety of reasons. Despite Ms. Doe's disclosure of her diagnosed conditions and suffering, Yale refused to extend comparable accommodations to her.

98.     Upon information and belief, Yale has granted other students at Yale SOM, including students with diagnosed conditions, accommodations to not be physically present in class.

99.     A student orientation leader in the Master's in Asset Management program communicated to incoming students in August 2024 that, with respect to grades of Fail and Pass in electives above and beyond the 36 required units, "everything is reviewed on a case-by-case basis" and that "AASL will work with the student and faculty to come up with the most favorable resolution for all parties involved." Although Yale's OIEA investigation credited Yale administrators' claim that this guidance was "incorrect," the communication reflects Yale's own representatives holding out a policy of flexible, case-by-case review—a flexibility that was never extended to Ms. Doe.

**U.      Damages**

100.    As a direct and proximate result of the acts and omissions of Yale described herein, Ms. Doe has suffered and continues to suffer damages including but not limited to:

a. Loss of her MMS-GBS degree from Yale School of Management;

b. Loss of her degree from HEC Paris, which was withheld as a consequence of Yale's actions;

c. Loss of her $20,000 scholarship due to her delayed enrollment;

d. Tuition, fees, and associated expenses paid to Yale;

e. Loss of F-1 visa status and the costs of obtaining alternative immigration status;

f. Loss of career opportunities and delayed entry into the workforce;

g. Medical and hospitalization expenses, including her inpatient psychiatric hospitalization;

h. Severe emotional distress, including depression, PTSD, suicidal ideation, anxiety, insomnia, and related physical symptoms;

i. Reputational harm from the notation of "academic dismissal" on her transcript; and

j. Other economic and non-economic losses to be proven at trial.

**CAUSES OF ACTION**

**COUNT ONE: DISABILITY DISCRIMINATION UNDER THE ADA**

100.      (1-100.) Plaintiff realleges and incorporates by reference the allegations set forth in all preceding paragraphs as though fully set forth herein.

101.      Title III of the ADA prohibits discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a).

102.      Yale University is a place of public accommodation within the meaning of 42 U.S.C. § 12181(7)(J), as a private educational institution.

103.      At all relevant times, Ms. Doe was an individual with a disability within the meaning of 42 U.S.C. § 12102, in that she had physical and mental impairments—including PTSD, depression, anxiety, and a sleep disorder—that substantially limited one or more major life activities, including but not limited to learning, concentrating, thinking, sleeping, and working.

104.      Ms. Doe was otherwise qualified to participate in and benefit from the MMS-GBS program. She completed 36 credit units at grades of Proficient or above, earned 28 credits in the Fall 2024 term with no grades below Proficient, and demonstrated consistent academic ability.

105.    Yale discriminated against Ms. Doe on the basis of her disability by, among other things:

a. Failing to provide reasonable modifications to its policies, practices, and procedures as necessary to afford Ms. Doe the full and equal enjoyment of the educational services provided by the MMS-GBS program;

b. Failing to grant a reasonable accommodation in the form of a deadline extension for MGT 667, considering the circumstances of Ms. Doe's airport detention and her documented disability;

c. Failing to consider Ms. Doe's disability as a mitigating factor in the Honor Committee proceeding and the resulting sanction;

d. Imposing academic dismissal without making reasonable accommodations for Ms. Doe's documented disability;

e. Refusing to consider documented medical evidence regarding Ms. Doe's disability and its impact on her academic performance;

f. Denying Ms. Doe's request for an adjustment to the appeal process on the ground that it was "retroactive," while ignoring Yale's own longstanding knowledge of her disability; and

g. Refusing to permit a grade change that would have brought Ms. Doe into compliance with the Quality Standard.

106.    Yale's failure to provide reasonable modifications did not require a fundamental alteration of the MMS-GBS program and would not have posed an undue hardship on the University.

107.    As a direct and proximate result of Yale's discrimination, Ms. Doe has suffered loss of her degree, loss of her visa status, psychiatric hospitalization, severe emotional distress, and other damages.

**COUNT TWO: DISABILITY DISCRIMINATION UNDER SECTION 504**

108.    Plaintiff realleges and incorporates by reference the allegations set forth in all preceding paragraphs as though fully set forth herein.

109.    Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

110.    Yale University receives federal financial assistance and is therefore subject to the requirements of Section 504.

111.    Ms. Doe is an individual with a disability within the meaning of Section 504, as described above.

112.    Ms. Doe was "otherwise qualified" to participate in and receive the benefits of the MMS-GBS program. She earned the 36 credit units required for degree conferral at grades of Proficient or above.

113.    Yale discriminated against Ms. Doe solely by reason of her disability by, among other things:

a. Failing to provide reasonable accommodations despite knowledge of her disability over a period spanning approximately two years;

b. Failing to engage in the interactive process upon learning of her disability and need for accommodation;

c. Applying the Quality Standard and dismissal process without considering her disability as a basis for reasonable modification;

d. Refusing to reopen or modify its appeal process to consider newly submitted medical documentation;

e. Through its agent, Jain, denying the existence of Ms. Doe's mental health conditions, dismissing her disclosures of sexual trauma, and treating her with hostility during the FRB proceeding; and

f. Characterizing any request for disability accommodation as "retroactive" despite Yale's own extensive, longstanding knowledge of her conditions.

114.    Yale acted with deliberate indifference to Ms. Doe's known disability. Yale officials had actual knowledge of Ms. Doe's disabilities through repeated, documented disclosures over approximately two years. Yale officials had the authority to provide accommodations and to take corrective action. Yale officials failed to act, and their failure to act was clearly unreasonable in light of the known circumstances.

115.    As a direct and proximate result of Yale's discrimination, Ms. Doe has suffered the injuries and damages described herein.

**COUNT THREE: DISCRIMINATION UNDER TITLE IX**

116.    Plaintiff realleges and incorporates by reference the allegations set forth in all preceding paragraphs as though fully set forth herein.

117.    Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination

under any education program or activity receiving Federal financial assistance." 20 U.S.C. §

1681(a).

118.    Yale University receives federal financial assistance and operates education

programs and activities within the meaning of Title IX.

119.    Yale was deliberately indifferent to the effects of the sexual assault Ms. Doe

endured while enrolled in the joint degree program. Yale had actual knowledge of Ms. Doe's

sexual assault through its joint program with HEC Paris and through Ms. Doe's multiple direct

disclosures to Yale officials, including Wilson, Sharif-Hyder, the Honor Committee, Dwyer,

and Jain.

120.    Ms. Doe's assailant was also enrolled in the same joint degree program. Despite

this, Yale failed to provide any supportive measures, accommodations, or resources to Ms.

Doe—whether related to her assailant or to the ongoing impact of the assault on her ability to

participate in the educational program.

121.    Yale's response to Ms. Doe's reports of sexual assault was clearly unreasonable.

Over a period of nearly two years, Yale officials received disclosures regarding Ms. Doe's

sexual assault and its impact on her mental health and academic performance, yet took no action

to provide support or accommodations. Yale officials instead subjected Ms. Doe to a rigid

disciplinary and dismissal process without regard for the effects of her sexual trauma.

122.    Jain, acting as Yale's agent, displayed deliberate indifference to Ms. Doe's

sexual assault at the FRB proceeding when he smirked at her disclosure of sexual assault,

refused to allow her to elaborate, shook his head, and told her to "shut up."

123.    Yale's pattern of handling Ms. Doe's sexual assault disclosures demonstrates

deliberate indifference: the University passed her complaint between offices—the Dean of

Students, Title IX, OIEA, SAS—without any office providing meaningful support or altering the academic outcome that her assault-related disabilities had precipitated.

124.    As a direct and proximate result of Yale's deliberate indifference, Ms. Doe was deprived of educational benefits and opportunities, including her degree, and suffered severe emotional distress and other injuries.

## COUNT FOUR: RETALIATION UNDER THE ADA

125.    Plaintiff realleges and incorporates by reference the allegations set forth in all preceding paragraphs as though fully set forth herein.

126.    The ADA prohibits retaliation against any individual who has opposed any act or practice made unlawful by the ADA, or who has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the ADA. 42 U.S.C. § 12203(a).

127.    Ms. Doe engaged in protected activity under the ADA, including: disclosing her disability to Yale officials; requesting reasonable modifications to Yale's policies, practices, and procedures on the basis of her disability; requesting adjustments to the appeal process as a disability accommodation; and filing a complaint with OIEA alleging disability discrimination.

128.    Following her engagement in protected activity, Yale subjected Ms. Doe to adverse actions, including but not limited to:

a. Denial of her appeal by the FRB, in a proceeding during which Jain, acting as Yale's agent, responded to Ms. Doe's disability disclosures with hostility, denial, and contempt;

b. Refusal to consider medical documentation submitted after the appeal, including the discharge attestation from Yale New Haven Psychiatric Hospital documenting the causal relationship between Ms. Doe's disability and her academic difficulties;

c. Refusal to permit the pending grade change in Fixed Income Securities that would have rendered the dismissal moot;

d. Revocation of her F-1 visa status as a consequence of the dismissal;

e. Notification to HEC Paris that Yale would not confer her degree, resulting in the loss of her HEC Paris degree; and

f. Refusal by a Yale therapist to meet with Ms. Doe following her hospitalization, without explanation.

129.    There is a causal connection between Ms. Doe's protected activity and the adverse actions taken against her. The temporal proximity between Ms. Doe's disability disclosures and accommodation requests and the adverse actions, combined with the hostility displayed by Yale's agent Jain in direct response to Ms. Doe's disability disclosures during the FRB proceeding, supports an inference of retaliatory motive. Jain's conduct—denying Ms. Doe's documented conditions, telling her to "shut up," accusing her of lying, and smirking at her disclosures—occurred in immediate response to her assertion of rights protected by the ADA.

130.    As a direct and proximate result of Yale's retaliation in violation of the ADA, Ms. Doe has suffered the injuries and damages described herein

**COUNT FIVE: RETALIATION UNDER SECTION 504**

131.    Plaintiff realleges and incorporates by reference the allegations set forth in all preceding paragraphs as though fully set forth herein.

132.    Section 504 of the Rehabilitation Act and its implementing regulations prohibit retaliation against any individual who has exercised rights protected under Section 504, including the right to request reasonable accommodations and to file complaints of disability discrimination. See 34 C.F.R. § 104.61 (incorporating 34 C.F.R. § 100.7(e)).

133.    Yale University receives federal financial assistance and is subject to the anti-retaliation provisions of Section 504.

134.    Ms. Doe engaged in protected activity under Section 504, including: disclosing her disability to multiple Yale officials over an extended period; requesting reasonable accommodations for her documented disabilities; requesting an adjustment to the FRB appeal process as a reasonable accommodation; and filing a formal complaint with OIEA alleging discrimination on the basis of disability in a federally funded program.

135.    Following her engagement in protected activity, Yale subjected Ms. Doe to the adverse actions described in Paragraph 128, incorporated herein by reference.

136.    There is a causal connection between Ms. Doe's protected activity and the adverse actions. Yale's refusal to reconsider its dismissal decision, its refusal to consider medical evidence, and its foreclosure of the grade change all occurred in temporal proximity to, and in the context of, Ms. Doe's assertions of her rights under Section 504. Yale's own OIEA Report acknowledged that "retaliation is prohibited against all individuals who participate in an OIEA review pursuant to the Policy Against Discrimination and Harassment," yet Yale took no steps to remediate the consequences of the dismissal following Ms. Doe's protected activity.

137.    As a direct and proximate result of Yale's retaliation in violation of Section 504, Ms. Doe has suffered the injuries and damages described herein.

**COUNT SIX: RETALIATION UNDER TITLE IX**

50.    Plaintiff incorporates by reference all preceding paragraphs as though set forth fully herein.

138.    Plaintiff realleges and incorporates by reference the allegations set forth in all preceding paragraphs as though fully set forth herein.

139.    Title IX prohibits retaliation against any individual who has made a report or complaint, testified, assisted, participated, or refused to participate in any manner in an investigation, proceeding, or hearing related to sex-based discrimination, including sexual assault. See 20 U.S.C. § 1681; 34 C.F.R. § 106.71.

140.    Yale University receives federal financial assistance and is subject to the anti-retaliation provisions of Title IX.

141.    Ms. Doe engaged in protected activity under Title IX, including: disclosing her sexual assault to multiple Yale officials, including Wilson, Sharif-Hyder, the Honor Committee, Dwyer, and Jain; disclosing her sexual assault during the FRB proceeding as context for her mental health disability and its impact on her academic performance; cooperating with the Title IX referral initiated by Jordan Colbert on May 19, 2025; meeting with Raquel McDowell, Associate Director of the Title IX Office of OIEA, on May 27, 2025; and filing her complaint with OIEA.

142.    Following her engagement in protected activity, Yale subjected Ms. Doe to adverse actions, including but not limited to:

a. Jain's hostile and demeaning treatment during the FRB proceeding in direct and immediate response to Ms. Doe's disclosure of her sexual assault—smirking, shaking his head, refusing to allow her to elaborate, and telling her to "shut up";

b. Yale's refusal, through the Title IX Office, to provide any support measures that would alter her academic standing, despite Ms. Doe's report of sexual assault and its documented effects on her academic performance;

c. Yale's continued refusal to reopen or modify the appeal process or to permit the grade change following the Title IX referral and OIEA complaint; and

d. The refusal by a Yale therapist to meet with Ms. Doe on two scheduled occasions following her hospitalization, without explanation, at a time when Ms. Doe had recently engaged in protected Title IX activity.

143.    There is a causal connection between Ms. Doe's protected activity and the adverse actions. The most direct evidence of retaliatory motive is Jain's conduct during the FRB proceeding: his hostile reaction occurred immediately upon and in direct response to Ms. Doe's disclosure of her sexual assault. Furthermore, Yale's post-appeal refusal to provide any remedial measures through its Title IX Office or through any other channel—despite acknowledging knowledge of the assault—is consistent with an institutional pattern of penalizing Ms. Doe for asserting her rights rather than supporting her.

144.    As a direct and proximate result of Yale's retaliation in violation of Title IX, Ms. Doe has suffered the injuries and damages described herein.

**COUNT SEVEN: BREACH OF CONTRACT**

145.    Plaintiff realleges and incorporates by reference the allegations set forth in all preceding paragraphs as though fully set forth herein.

146.    The relationship between a student and a private university is contractual in nature. The terms of the contract are established by the university's catalogues, bulletins, circulars, and regulations.

147.    The SOM Bulletin, including its provisions on academic requirements, the Honor Code and its procedures, the Quality Standard, and the appeal process before the Faculty Review Board, formed the basis of an express and/or implied contract between Ms. Doe and Yale.

148.    Ms. Doe applied to, was admitted to, enrolled in, and paid tuition and fees for the MMS-GBS program in reliance on the reasonable expectation that Yale would implement and enforce its published policies and procedures with basic fairness.

149.    Yale breached its contractual obligations to Ms. Doe in the following respects, among others:

a. Failing to provide Ms. Doe with the two-week (ten working day) period to file an appeal of academic dismissal, as required by the SOM Bulletin, instead scheduling the FRB hearing approximately one day after notice of dismissal;

b. Failing to permit Ms. Doe to be accompanied by an advisor at the FRB proceeding, as provided by the Procedures of the Honor Committee in the SOM Bulletin;

c. Failing to provide Ms. Doe with all written materials at least 48 hours in advance of the FRB meeting, as required by the SOM Bulletin;

d. Failing to provide Ms. Doe with an opportunity to object to committee members prior to the proceeding, as provided by the SOM Bulletin;

e. Conducting the FRB appeal with a single administrator rather than a full Faculty Review Board panel;

f. Failing to confer Ms. Doe's degree despite her completion of 36 credit units at grades of Proficient or above, satisfying the express degree requirements set forth in the SOM Bulletin; and

g. Foreclosing the opportunity for a professor-initiated grade change that would have brought Ms. Doe into compliance with the Quality Standard.

150.    The standard for evaluating Yale's contractual obligations is the reasonable expectation of the student—i.e., what meaning the student should reasonably have attributed to Yale's published policies and procedures.

151.    Ms. Doe's reasonable expectation was that Yale would follow its own published procedures, afford her the procedural protections enumerated therein, and confer her degree upon completion of the stated requirements.

152.    As a direct and proximate result of Yale's breach of contract, Ms. Doe has suffered the injuries and damages described herein

**COUNT EIGHT: BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

153.    Plaintiff realleges and incorporates by reference the allegations set forth in all preceding paragraphs as though fully set forth herein.

154.    Under Connecticut law, every contract carries an implied covenant of good faith and fair dealing. The contractual relationship between Ms. Doe and Yale carried with it an implied obligation that proceedings affecting her academic standing would be conducted with basic fairness.

155.    Yale breached the implied covenant of good faith and fair dealing by, among other things:

a. Conducting the FRB proceeding in a manner that was hostile, dismissive, and designed to foreclose Ms. Doe from meaningfully presenting her case;

b. Providing Ms. Doe with incorrect advice through Sharif-Hyder regarding the withdrawal of her appeal, and then penalizing her reliance on that advice;

c. Providing Ms. Doe with assurances through Dwyer and Foley that her credits were sufficient for degree conferral, and then dismissing her without regard for those assurances;

d. Refusing to consider documented medical evidence that directly bore upon the academic performance at issue;

e. Foreclosing a grade change that would have rendered the dismissal moot; and

f. Ignoring Ms. Doe's documented disabilities and their impact on her academic performance while applying the Quality Standard in a rigid and mechanical fashion.

156.    As a direct and proximate result of Yale's breach of the implied covenant of good faith and fair dealing, Ms. Doe has suffered the injuries and damages described herein.

**COUNT NINE: PROMISSORY ESTOPPEL**

157.    Plaintiff realleges and incorporates by reference the allegations set forth in all preceding paragraphs as though fully set forth herein.

158.    Yale, through its officials, made clear and definite promises to Ms. Doe upon which she reasonably relied to her detriment, including:

a. Foley's assurance on or about May 11, 2025, that Ms. Doe's Spring 2025 grades would not be a concern because she had completed the 36 credit units required for her degree with grades of Highest Honors, Honors, and Proficient;

b. Dwyer's acknowledgment during their meeting that Ms. Doe's completion of credits far in excess of those required should suffice to receive her degree;

c. Sharif-Hyder's advice that Ms. Doe could withdraw her appeal of the Honor Committee sanction after exams so she would be "looked at more favorably"; and

d. Jain's initial statement during the FRB that a professor-initiated grade change would be acceptable.

159.    Ms. Doe relied on these promises to her detriment—among other things, by following Sharif-Hyder's advice regarding the withdrawal of her appeal, by refraining from taking additional steps to secure the grade change before the FRB meeting, and by continuing to believe that her academic standing was secure.

160.    Injustice can be avoided only by enforcement of these promises or by awarding Ms. Doe damages for her detrimental reliance.

**COUNT TEN: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

161.    Plaintiff realleges and incorporates by reference the allegations set forth in all preceding paragraphs as though fully set forth herein.

162.    Yale, through its agents and employees acting within the scope of their authority, engaged in extreme and outrageous conduct that exceeded all bounds tolerated by a decent society, including:

a. Jain's conduct during the FRB proceeding—interrupting Ms. Doe repeatedly, denying the existence of her medically documented mental health conditions without qualification, smirking when she disclosed her sexual assault, shaking his head, refusing to hear about her sexual trauma, accusing her of lying, and telling her to "shut up";

b. Dismissing Ms. Doe from her degree program on the eve of graduation despite her having completed all substantive degree requirements, knowing that dismissal would trigger the loss of her F-1 visa and force her departure from the country during a period of heightened immigration enforcement;

c. Refusing to consider medical evidence from Yale's own psychiatric hospital documenting that Ms. Doe's mental health conditions contributed to her academic difficulties;

d. Providing Ms. Doe with incorrect procedural advice and then denying her the opportunity to correct the consequences of that reliance; and

e. Refusing to permit a grade change that would have rendered the entire dismissal moot.

163.    Yale knew or should have known that its conduct would cause Ms. Doe severe emotional distress, given her disclosed disabilities, her sexual assault history, her status as an international student facing visa revocation, and her proximity to degree completion.

164.    As a direct and proximate result of Yale's extreme and outrageous conduct, Ms. Doe suffered severe emotional distress, including but not limited to psychiatric hospitalization, suicidal ideation, exacerbation of her PTSD and depression, anxiety, insomnia, and physical symptoms.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff respectfully prays for:

A. A declaratory judgment;

B. A permanent injunction requiring Yale University to:

(i) confer the MMS-GBS degree upon Ms. Doe; (ii) expunge the notation of "academic dismissal" from Ms. Doe's academic transcript and replace it with a notation reflecting degree conferral; (iii) notify HEC Paris that Ms. Doe has been awarded her degree by Yale; and (iv) revise its policies and practices to ensure compliance with disability law;

C. Compensatory damages;

D. Attorney's fees and costs; and

E. Such other and further relief as this Court deems just and proper.

Respectfully Submitted,

PLAINTIFF
By:_____/s/_____
Alexander T. Taubes, Esq.
Federal Bar No.: ct30100
Alexander T. Taubes
470 James Street, Suite 007
New Haven, CT 06513
(203) 909-0048
alextt@gmail.com